# RICHARD FONTANA *v.* ZYMOL ENTERPRISES, INC.
## (AC 25946)

Schaller, Flynn and Stoughton, Js.*

Argued January 17—officially released May 23, 2006

---

\* The listing of judges reflects their status on this court as of the date of oral argument.

*Paul D. Buhl,* for the appellant (defendant).

*Pasquale Young,* for the appellee (plaintiff).

*Opinion*

STOUGHTON, J. The defendant, Zymol Enterprises, Inc., appeals from the judgment rendered after a jury verdict in favor of the plaintiff, Richard Fontana. The defendant claims that the court improperly (1) denied its motion for a remittitur and (2) instructed the jury on the exception to the statute of frauds. We affirm the judgment of the trial court with respect to the first claim and dismiss the appeal as to the defendant's second claim.

The jury reasonably could have found the following facts. In 1985, the plaintiff and his son-in-law, Charles E. Bennett, founded Zymol Enterprises, a business that manufactures car cleaning products. In 1988, the business was incorporated as Zymol Enterprises, Inc., the defendant in this action. Bennett was the president and the plaintiff was the vice president of the defendant corporation, with each owning 40 percent of its stock. In 1993, the plaintiff suffered a heart attack and was unable to return to work. Bennett offered to buy the plaintiff's interest in the defendant corporation, and the plaintiff agreed.

On October 27, 1993, the plaintiff entered into a deferred compensation agreement (agreement) with the defendant. Pursuant to the agreement, the plaintiff was to receive $295,000 over a ten year term commencing on November 1, 1993, and ending on October 1,

2003, payable in monthly installments of $2500.[1] The defendant also agreed to pay an additional $325 per month each to the plaintiff and his wife until they reached the age of sixty-five. That amount was intended to enable the plaintiff and his wife to obtain medical insurance until they became eligible for medicare.

As part of the agreement, the plaintiff, who knew all of the product formulae and customer lists, agreed not to compete with the defendant. He also agreed to provide advisory and consulting services to the defendant up to a maximum of twelve hours per month. The payment of the full $295,000 was not contingent on the plaintiff's performance of those services, however, and the agreement specifically provided that the plaintiff was to continue to receive payments in the event that he was not capable of working due to disability or death.

At no time did the plaintiff or his wife ever receive the monthly installments of $325 that the defendant had agreed to pay for their medical insurance. Instead, the defendant continued to cover the plaintiff and his wife under its group medical insurance policy. The plaintiff did not object to this alternative.

Gradually, the amount of work performed by the plaintiff for the defendant increased beyond the twelve hours per week designated in the agreement. The plaintiff took telephone calls, received and answered e-mail correspondence on a computer provided by the defendant, trained new employees in product use and went to trade shows and seminars when requested to do so by the defendant. By 2000, the plaintiff was working approximately forty hours per week during the peak

---

[1] Except for the first year of the agreement, during which, pursuant to a stock redemption agreement entered into by the parties on the same date and apparently incorporated into the agreement, the plaintiff would receive only $25,000, paid in equal monthly installments of $2083.33. The parties' obligations during the first year of the agreement, however, are not at issue in this appeal.

months of the automotive season. The plaintiff mentioned this increase in workload to Bennett, who stated that, as compensation for the extra work, the defendant would continue covering the plaintiff and his wife on its medical insurance beyond the dates specified in the agreement.

The plaintiff became eligible for medicare in October, 1995, seven months prior to his sixty-fifth birthday, due to a total disability. He informed the defendant of his early eligibility for medicare, yet the defendant continued to cover him on its insurance policy. When the plaintiff's wife reached the age of sixty-five and therefore became eligible for medicare in July, 2001, the defendant continued to pay for her insurance coverage as well.

On February 13, 2002, Bennett called the plaintiff to the defendant's headquarters and presented him with a document stating that he had been overpaid on the agreement because of the additional medical insurance provided to him and his wife. Bennett informed the plaintiff that, as credit for this overpayment, the defendant planned to terminate the payments of $2500 before the end of the agreement's term. The document presented to the plaintiff set forth two alternative schedules for how he could receive what the defendant calculated to be the remainder of the amount it owed under the agreement. When the plaintiff rejected both options, Bennett proposed an alternative. He stated that if the plaintiff would agree to work additional hours, the defendant would continue to make the monthly payments of $2500 and cover the plaintiff's medical insurance until the end of the agreement's term. The plaintiff agreed to carry a cellular telephone eight hours per day, five days per week, and answer all calls. Two days later, the defendant provided him with a cellular telephone.

In early August, 2002, the plaintiff received a letter from Kevin Houlihan, the defendant's accountant. The letter notified the plaintiff that the defendant was ending its payments of $2500 and his insurance coverage as of October 31, 2002, the date on which it determined its liability to be extinguished under the agreement. The plaintiff contacted Houlihan to tell him of the new oral agreement he had made with Bennett, but Houlihan stated that he was not aware of any oral agreement. The plaintiff attempted but was unable to contact Bennett by telephone. He continued to work for the defendant until he was asked to return his cellular telephone in September, 2002. He stopped receiving payments and insurance coverage after October 31, 2002.

The plaintiff brought an action against the defendant, seeking the $30,000 he claimed was due under the agreement. The action went to the jury in two counts. In the first count, the plaintiff alleged that the defendant had breached the agreement by refusing to pay him for the last year of the agreement's term. In the second count, the plaintiff alleged that the defendant had breached an oral agreement to continue payments over the term of the agreement in return for an increase in his services to the defendant. The defendant pleaded by way of special defense that it had paid the full amount due through its health insurance payments. The jury returned a verdict in favor of the plaintiff on each count.[2] It awarded damages of $30,000 on the first count and zero damages on the second count. After the verdict was accepted, the defendant filed a motion for an order of remittitur, which the court denied. This appeal followed.

I

The defendant first challenges the court's denial of its motion for remittitur on the first count. It contends

---

[2] See part I.

that the jury's verdict in favor of the plaintiff for $30,000 was excessive because it failed to account for the reasonable value of the health insurance benefits conferred on the plaintiff in excess of the amount to which he was entitled under the agreement. We are not persuaded.

"[T]he amount of damages awarded is a matter peculiarly within the province of the jury . . . . [I]t is the jury's right to accept some, none or all of the evidence presented." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Lefebre*, 92 Conn. App. 417, 422, 885 A.2d 1232 (2005). "The court's broad power to order a remittitur should be exercised only when it is manifest that the jury have included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Internal quotation marks omitted.) *Tomczuk* v. *Alvarez*, 184 Conn. 182, 188, 439 A.2d 935 (1981). "The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . . It is the function of this court to determine whether the trial court abused its discretion in denying [a defendant's] motion to set aside the verdict." (Citations omitted; internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 320–21, 852 A.2d 703 (2004).

In support of its claim that the jury's verdict of $30,000 in favor of the plaintiff on the first count was excessive and contrary to the evidence presented at trial, the defendant cites the undisputed evidence it presented indicating that it had covered the plaintiff and his wife on its health insurance policy for months beyond the dates specified in the agreement. Although the plaintiff testified that Bennett obligated the defendant to provide the additional coverage in a later oral agreement, the defendant contends that the jury rejected the plaintiff's claim because it ostensibly ruled in the defendant's

favor on the second count. The defendant reasons that because the jury determined that there was no oral agreement to confer additional insurance coverage, and because undisputed evidence was presented establishing that the defendant did confer that additional benefit, the damages to which the jury found the plaintiff entitled should have been reduced by the reasonable value of the additional benefit conferred.

The defendant cannot succeed because the underlying premise for its argument, that the jury found in its favor on the second count, simply is incorrect. In their arguments before this court, both parties assumed that because the jury awarded zero damages on the second count, it returned a verdict in favor of the defendant on that count. The completed jury form indicates, however, that the jury returned a verdict in favor of the plaintiff on both counts.[3] See, e.g., *DeVito* v. *Schwartz*, 66 Conn. App. 228, 232 n.4, 784 A.2d 376 (2001). Indeed, the court, in ruling on the defendant's motion for remittitur, interpreted the jury's verdict as being in favor of the plaintiff on the second count.[4] We conclude that the court's interpretation, not that of the parties, was correct.

Because the jury's verdict was in favor of the plaintiff on the second count, the court ruled correctly in denying the defendant's motion for remittitur because the verdict was not contrary to the law or to the evidence presented at trial. There was evidence from which the jury could have found that the defendant had not paid

---

[3] The verdict form, entitled "Plaintiff's Verdict Form," states: "[T]he jury finds *the issues* in favor of the Plaintiff, Richard Fontana, as against the Defendant, Zymol Enterprises, Inc. . . ." (Emphasis added.) The defendant did not except to the verdict forms submitted to the jury.

[4] The court stated: "Now, the issue is or becomes, was there an agreement relative to an oral contract? The plaintiff says yes there was. The defendant says no, there was never any agreement. Thus, this becomes a question for the jury. Since the [jurors] found in favor of the plaintiff in their verdict, they must have believed him and not believed the defendant's corporate officer, who testified that there was no agreement."

the plaintiff the $30,000 due under the agreement, and, in fact, the defendant does not dispute that it made no payments in the final year of the agreement. Although the defendant claimed that the plaintiff was not entitled to the money because he had received additional health insurance equal to that amount,[5] the jury was free to reject this argument, which it did. The defendant failed to request that interrogatories be submitted to the jury; see *Peters* v. *Carra*, 10 Conn. App. 410, 412, 523 A.2d 922 (1987); and, thus, we do not know the specific basis on which the jury rejected the special defense. We conclude, however, that in light of the evidence presented at trial, the jury reasonably could have arrived at its decision.[6] The court's denial of the defendant's motion for remittitur, consequently, was not improper.

II

The second claim made by the defendant on appeal is that the court improperly instructed the jury on the equitable estoppel exception to the statute of frauds.[7]

[5] We note that although the defendant pleaded, by way of special defense, payment of the amount owed, what the defendant actually alleged was a setoff, which, pursuant to Practice Book § 10-54, properly would have been pleaded as a counterclaim. See, e.g., *225 Associates* v. *Connecticut Housing Finance Authority*, 65 Conn. App. 112, 121–22, 782 A.2d 189 (2001).

[6] For example, the jury could have rejected the special defense on the basis of the fact that the parties' agreement never called for the defendant to cover the plaintiff on its insurance policy or because the only evidence presented by the defendant as evidence of its expenditures on the insurance premiums was a spreadsheet drafted by the defendant's accountant or because of the plaintiff's testimony that the defendant had agreed to provide that additional insurance coverage in a subsequent oral agreement.

[7] "Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct. . . . In its general application, we have recognized that [t]here are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. . . . This court previously has applied the doctrine of equitable estoppel to bar a party from asserting

We decline to review this claim for lack of subject matter jurisdiction because the defendant has failed to demonstrate that it was aggrieved by the jury's verdict on the second count.

"It is settled law that the right to appeal is purely statutory and is allowed only if the conditions fixed by statute are met. . . . In all civil actions a requisite element of appealability is that the party claiming error be aggrieved by the decision of the trial court. . . . The test for determining [classical] aggrievement encompasses a well settled twofold determination: first, the party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community as a whole; second, the party claiming aggrievement must establish that this specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) *In re Allison G.*, 276 Conn. 146, 156–57, 883 A.2d 1226 (2005). "[A] party cannot be aggrieved by a decision that grants the very relief sought. . . . Such a party cannot establish that a specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) Id., 158.

"Mootness is a threshold issue that implicates subject matter jurisdiction, which imposes a duty on the court to dismiss a case if the court can no longer grant practical relief to the parties. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Pritchard* v. *Pritch-*

the statute of frauds as a defense so as to prevent the use of the statute itself from accomplishing a fraud." (Citations omitted; internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 60, 873 A.2d 929 (2005).

*ard*, 92 Conn. App. 327, 339–40, 885 A.2d 207 (2005), cert. granted on other grounds, 277 Conn. 913, 895 A.2d 790 (2006).

The court's instruction regarding the statute of frauds applied only to the second count of the complaint, which alleged an oral agreement between the parties. Although the jury ruled in favor of the plaintiff on the second count,[8] it awarded the plaintiff zero damages.[9] The defendant has failed to present any evidence indicating that it has been harmed by the jury's verdict on this count.[10] Aggrievement and mootness are related concepts. *In re Allison G.*, supra, 276 Conn. 156. In the present case, they combine to dispose of the defendant's second claim because the defendant received precisely the relief it had sought with respect to the second count. See id. Accordingly, we decline to address the defendant's claim. See also *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 152 n.12, 681 A.2d 293 (1996) (declining to review defendant's claims regarding count on which jury found in favor of plaintiff but awarded no damages).

The appeal is dismissed in part, and the judgment is affirmed.

In this opinion the other judges concurred.

---

[8] See part I.

[9] We note that the jury's award of zero damages on the second count is not inconsistent with the evidence presented at trial because the total damages claimed by the plaintiff was $30,000, and that amount was awarded to the plaintiff on the first count.

[10] Despite the defendant's contention otherwise, we cannot say that had the jury found in favor of the defendant on the second count, it would have had to have found in favor of the defendant on its special defense. We do not know the basis for the jury's rejection of the defendant's special defense; see part I; and there were alternate grounds on which the jury could have based its decision. See footnote 6.